**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WICKES FURNITURE COMPANY, INC., a Delaware company, | ) ) ) | |
| Plaintiff, | ) ) ) | No. 06 C 4862 |
| v. | ) | |
| IRA CARPMAN, CAMCO PACIFIC CONSTRUCTION COMPANY, INC., and PCI FLORTECH, INC., | ) ) ) ) | HONORABLE DAVID H. COAR |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Wickes Furniture Company, Inc. ("Wickes") brought suit against Ira Carpman ("Carpman"), Camco Pacific Construction Company, Inc. ("Camco") and PCI FlorTech Inc. ("Flortech") (collectively, the "Defendants") alleging several violations of state law including breach of fiduciary duty and constructive trust against Carpman individually, inducing breach of fiduciary duty against Camco and FlorTech, breach of contract against Camco, conversion against FlorTech, and conspiracy to defraud against all Defendants. Wickes also alleges Racketeering against all Defendants in Count VII. Jurisdiction is alleged to be proper under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 1337 (regulation of commerce), and 18 U.S.C. 1964(c) (civil RICO). Before the Court now are motions to dismiss filed by Camco and FlorTech, Camco's motion made pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1) and 12(b)(6) and FlorTech's motion pursuant to Fed. R. Civ. Pro. 12(b)(6) only. For the reasons stated below both motions are GRANTED in Part and DENIED in Part.

## I. FACTUAL BACKGROUND[1]

Wickes is a Delaware corporation engaged in the business of retail furniture sales in various locations throughout the United States. Wickes' corporate headquarters is located in Wheeling, Cook County, Illinois. Carpman was, at all times relevant to the Amended Complaint, a citizen of Wisconsin, and employed by Wickes as its Construction Manager. In that capacity, Carpman was responsible 1) for the development and administration of contracts for the construction of Wickes' store facilities in several states, including California and Illinois; 2) for the selection of architects and general contractors and subcontractors; and 3) for deciding whether to accept work and pay amounts billed to it by such contractors. Camco is a California corporation with its principal place of business in California. Flortech is an Illinois corporation with its principal place of business in Addison, Illinois.

Carpman began his employment as Construction Manager for Wickes in 1998. Wickes alleges that the Defendants associated themselves in two distinct schemes to defraud Wickes through mail fraud, wire fraud, and the interstate transportation of stolen property. The first scheme involved the construction of several Wickes' store facilities in California and the second scheme involved the construction of several Illinois stores. In connection with the construction of seven new stores for Wickes, located in California and Illinois, the Defendants agreed that Carpman, in exchange for loans and other considerations from Flortech and Camco, would contract for construction work on behalf of Wickes, often on a no-bid basis, and accept change order requests from Flortech, Camco, and others. The combined effect of the contracts and

---

[1] For the purposes of this motion, the facts alleged in Plaintiff's Amended Complaint are taken as true.

change orders was to overcharge Wickes by inflating the cost of the construction of each building beyond what Wickes had authorized Carpman to pay and in excess of the fair and reasonable value of the work performed.

*Scheme One- California Stores*

In early 2004, Wickes decided to open a new store in Rancho Cucamonga, California (the "Rancho store"). After receiving bids for the construction, Carpman recommended to Wickes, and Wickes agreed, to award a general contract for the Rancho store to Camco for a stipulated price. In addition, Carpman recommended, and Wickes agreed, to contract directly with FlorTech to provide flooring materials, also at a fixed price, for the same store. FlorTech's bid contemplated that FlorTech would provide extra materials to be warehoused by FlorTech for use in the event that flooring needed to be replaced in the future.

In exchange for loans and other consideration provided by Camco to Carpman, Carpman agreed to accept the substitution of cheaper materials and building techniques (without insisting on a price credit) and to permit Camco to complete the project at a profit. Carpman also accepted change order requests from Camco for non-existent and over-valued work, which resulted in raising the costs of the Rancho store. Camco's stipulated price for the Rancho store included flooring. However, in exchange for loans and other consideration provided by FlorTech to Carpman, Carpman arranged for Wickes to contract directly with FlorTech to provide flooring materials for the Rancho store, ostensibly because Wickes needed to use the same source for flooring for each of its stores to obtain economies of scale and to obtain warehousing services for "scrap" flooring. Wickes alleges those same supplies could have been obtained by other providers based in California and included in the general contract. Ultimately,

the economies of scale never materialized and no "scrap" flooring was ever warehoused by FlorTech for the California stores. Wickes concedes that although the direct contract between it and FlorTech meant that Camco no longer had to provide flooring for the Rancho store, Camco only partially credited the amount saved against the stipulated contract price. The ultimate effect of this scheme was to inflate Wickes' payments to FlorTech and to Camco.

In connection with three subsequent California projects, Carpman accepted bids from Camco without competitive bidding. Camco did not include flooring in these bids because it understood that FlorTech would provide flooring. Wickes alleges that Camco could have subcontracted to obtain the same flooring material, instead of Wickes directly contracting with FlorTech, which would have saved Wickes money due to the extra costs and delays deriving from logistical complications of having dual direct contracts.

During the construction of the three California projects, Camco submitted and Carpman accepted, change orders increasing the cost of the projects. Wickes concedes some of the change orders were legitimate, but nonetheless alleges many of the change orders obligated Wickes to pay additional sums for work that 1) was already properly included in Camco's original bid, 2) was not actually performed, 3) was unnecessary, or 4) represented contractual penalties for which Wickes was not responsible.

FlorTech's bids contemplated that it would supply and warehouse additional flooring materials for the three subsequent California stores to be held in reserve in case flooring was damaged in the future but FlorTech did not, in fact, provide the additional materials. Furthermore, Wickes alleges that the "scrap" flooring materials from one project were used in subsequent projects, for which FlorTech charged Wickes again. In addition, Camco charged and

Carpman authorized, additional sums for change orders for flooring work that it performed but should have been performed by FlorTech.

Camco submitted bids, change order requests, and demands for payment to Wickes at its offices in Wheeling, Illinois primarily by means of commercial interstate carrier delivery. Wickes details the dates of some of those deliveries, with the initial date as September 27, 2005 and the last date as November 1, 2005. FlorTech obtained flooring materials in interstate commerce, including from a carpet supplier doing business in Georgia, and submitted bids, invoices, and demands for payment to Wickes primarily through intrastate courier delivery from its offices in Chicago. Wickes details the dates of some of those deliveries are identified, with the first date as May 3, 2005 and the last date as September 13, 2005. Carpman arranged for the overpayment of Camco and FlorTech both by approving fraudulent change orders and by obtaining payment by Wickes to Camco and FlorTech for amounts in excess of their contract prices.

Wickes financed the construction of the California stores through "build to lease" arrangements pursuant to which landlords reimbursed Wickes for many of its expenditures from tenant improvement allowances, which are in turn amortized over the life of long-tern leases between Wickes and the landlords. In order to obtain reimbursement for Wickes expenditures for the California stores, Carpman submitted demands for reimbursement to each landlord by means of commercial interstate carrier services. These demands included the inflated amounts Wickes had already paid to Camco and FlorTech. Wickes claims to have been damaged by the inflated charges for the construction of its stores because each store ended up costing more than its respective tenant improvement allowance, and Carpman caused the gaps to be paid by

Wickes. In addition, the amortized amount of each tenant improvement allowance is included in the lease payments for which Wickes is responsible, such that the ultimate cost of the overcharges, with interest, has been and will continue to be paid by Wickes for the life of the leases.

In November of 2005, Wickes discovered some of Carpman's activities because of the accumulation of cost overruns on the projects whose construction he managed. Upon its discovery of Carpman's activities, Wickes immediately terminated him and reviewed its open construction contracts and the payments claimed thereon, to ensure that it would not be further victimized. Wickes states that delays and disruption caused by that review, together with legal expenses in litigation that resulted, have caused Wickes to suffer additional financial losses, some of which are still continuing and have yet to be determined.

*Scheme Two- Illinois Stores*

Carpman supervised the contracting and construction of four stores in Illinois. Carpman arranged direct contracts with FlorTech for flooring materials and installation which were priced as if FlorTech would provide and warehouse additional "scrap" flooring materials for future repairs. Some or all of the "scrap" flooring materials were either not provided or were incorporated, and paid for again, in subsequent store projects. As a result of those actions, FlorTech submitted bids and invoices to Wickes through *intrastate* couriers. Carpman, in turn, forwarded requests for reimbursement incorporating the fraudulent contract amounts to landlords in locations inside and outside of Illinois using private courier services. Under the fraudulent contracts arranged between Carpman and FlorTech, Wickes paid more than the fair and reasonable cost of flooring for the Illinois stores.

## II. STANDARD OF DECISION

Under Federal Rule of Civil Procedure 8(a), a complaint generally need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. *Leatherman v. Tarrant County Narcotics Unit*, 507 U.S. 163, 168 (1993). "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). In deciding a motion to dismiss for failure to state a claim, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *See Ameritech Corp. v. McCann*, 297 F.3d 582, 585 (7th Cir. 2002). If a claim fails to allege a necessary element required to obtain relief, however, dismissal is required. *See R.J.R. Services., Inc. v. Aetna Cas. and Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989).

A complaint "must at least include the operative facts upon which a plaintiff bases his claim." *Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir. 1992). When reviewing the complaint, only factual allegations will be considered; legal conclusions are not binding upon the court. *See Reichenberger v. Pritchard*, 660 F.2d 280, 282 (7th Cir. 1981). The complaint must state either direct or inferential allegations concerning all material elements necessary for recovery under the chosen legal theory. *Glatt v. Chicago Park District*, 847 F. Supp. 101, 103 (N.D. Ill. 1994). Any ambiguities are construed in favor of the plaintiff. *Curtis v. Bembenek*, 48 F.3d 281, 283 (7th Cir. 1995). The court, however, need not "strain to find inferences favorable to the plaintiffs which are not apparent on the face of the complaint." *Coates v. Illinois State Bd. of Ed.*, 559 F.2d 445, 447 (7th Cir. 1997).

Furthermore, the Seventh Circuit recently applied a more rigorous standard of decision to a RICO claim, which recognized that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.... Factual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)...." *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 472 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (U.S. 2007).[2]

## III.  ANALYSIS

### A. Section 1962(c) RICO Violation

Although Congress enacted RICO to better combat organized crime, the statute was written broadly enough to apply to conduct outside the traditional purview of organized crime. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 248 (1989). A RICO plaintiff alleging a violation of § 1962(c) must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Defendants claim that Wickes has not sufficiently pleaded the elements of a civil RICO claim.

---

[2] Camco also attacks the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, but such attack is secondary to the attack made on Rule 12(b)(6) grounds. In deciding a motion to dismiss for lack of subject-matter jurisdiction, the district court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *See Transit Exp. Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001). When a party moves for dismissal under Rule 12(b)(1), the nonmoving party must provide competent proof of jurisdictional facts to support its allegations. *Thomason v. Gaskill*, 315 U.S. 442, 446 (1942); *Kontos*, 826 F.2d at 576.

### 1. Enterprise

First, Defendants claim that the Amended Complaint does not sufficiently plead the existence of a RICO "enterprise". Title 18 U.S.C. § 1961(4) defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact." The RICO "enterprise" is separate and apart from the pattern of racketeering activity in which it allegedly engages. *United States v. Turkette*, 452 U.S. 576, 583 (1981). It "must have 'an ongoing *structure*' of persons associated through time, *joined* in purpose, and organized in a manner amenable to hierarchical or consensual decision making." *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) (emphasis added). Thus, the distinctive characteristics that differentiate a RICO "enterprise" from a non-criminal "association-in-fact" or a conglomeration of legally cognizable entities are its organizational structure and its goals, both of which must necessarily be identified in the complaint. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000).

Wickes complains that Carpman, Camco and FlorTech "associated themselves in a scheme to defraud Wickes...." (Amended Complaint, ¶9.) That is the extent of Wickes' distinct pleading on the structure of the RICO enterprise at issue in this action. Even in its response to the Defendants' motions to dismiss, instead of providing a basis for the separate and distinct existence of a RICO "enterprise", Wickes attempts to identify the RICO enterprise primarily through discussion of the Defendants' conduct. Wickes contends that its discussion of the Defendants' "division of responsibility" in the actions of the enterprise constitutes sufficient pleading of the "structure" element. It cites *Gas Technology Institute v. Rehmat* in support of its proposition. 2006 WL 3743576 (N.D. Ill. 2006).

Wickes is correct that the division of responsibility can constitute sufficient pleading of the structure element. However, in such cases, the pleading, through its discussion of the division of responsibility, must sufficiently set out how the organization exhibits hierarchal or consensual decision-making in pursuance of a single purpose in which all members are joined. *See Jennings*, 910 F.2d at 1440. What Wickes should have taken from *Rehmat* is that in that case, the complaint contained enough detail about each members' position and hierarchy in the enterprise to allow the Court to readily identify a definite structure. *Rehmat*, 2006 WL 3743576 at *30. In direct contrast, the Amended Complaint here is devoid of allegations as to the hierarchical positions of the three Defendants. Again, the Seventh Circuit has described a RICO enterprise as an association of "persons associated through time, joined in purpose, and <u>organized in a manner amenable to hierarchical or consensual decision-making</u>." *Jennings*, 910 F.2d at 1440 (emphasis added). Wickes merely alleges that Carpman, as an employee of Wickes, steered contracts to, facilitated overpayments made by Wickes to, and was complicit in fraudulent billing made by, Camco and FlorTech; all in exchange for loans and other consideration. There is nothing in the Amended Complaint from which this Court can infer hierarchical or consensual decision-making among the three Defendants directed towards a single purpose.

In *United States v. Errico*, the Second Circuit held that a hub and spoke structure constituted an "enterprise" as defined at 18 U.S.C. § 1961(4). 635 F.2d 152, 156 (1980). Wickes argues that the "enterprise" in *Errico* is akin to the one alleged here. The *Errico* court explained that the "enterprise" there was comprised of one circle of jockeys and one circle of bettors connected to each other through the defendant, Errico, with all participants having a

single purpose to profit from fixing horse races. *Id.* Thus, in *Errico*, the two independent "spokes" performed specific acts that benefitted each other and were necessary to achieve the single purpose of the entire group; the jockeys earning bribes and the bettors earning fixed, riskless betting profits. Here, the allegations of the Amended Complaint do not provide that the actions of Camco, on the one hand, or FlorTech on the other, benefitted each other or were necessary to the fulfillment of the underlying frauds purportedly made upon Wickes committed by the "enterprise". Camco's alleged fraud benefitted Camco and Carpman. FlorTech's alleged fraud benefitted FlorTech and Carpman. There is no alleged connection or practical nexus between the conduct of FlorTech and Camco.

Wickes attempts to show otherwise. Wickes explains that there were two distinct schemes carried out by the claimed "enterprise". In the first, Camco's stipulated price for the Rancho store included flooring. However, in exchange for loans and other consideration provided by FlorTech to Carpman, Carpman arranged to contract directly with FlorTech to provide flooring materials for the Rancho store. Wickes concedes that under the direct contract between it and Camco, Camco did not have to provide flooring for the Rancho store, but nevertheless claims that only a partial credit against the stipulated contract price was obtained from Camco. In three subsequent projects, Carpman accepted bids from Camco again, each time without flooring. Here is Wickes' purported "smoking gun": Wickes alleges Camco knew Carpman would contract with FlorTech to do the flooring and thus did not include flooring in its bids, but Camco ended up doing some of FlorTech's work and then charged Wickes for that work that should have been performed by FlorTech. FlorTech then disingenuously billed Wickes as if it had done the work. Such pleading fails to even demonstrate a conspiracy

between the three Defendants, let alone a RICO "enterprise" made up of Camco, FlorTech and Carpman. Who else but Wickes was Camco to bill for the extra contractual work it performed? In the second scheme, Wickes makes no allegations that implicate any conduct by Camco. In this alleged scheme, FlorTech and Carpman purportedly conspired to dupe Wickes into paying artificially inflated costs for the construction of stores in Illinois.

In sum, Wickes has alleged that Camco's bids did not include flooring because Camco knew FlorTech would provide it, but FlorTech did not provide it, so Camco did, and then Camco charged Wickes for it. There is nothing remotely criminal in that series of allegations. It is not clear from the Amended Complaint, but the Court will assume that Wickes is alleging Flortech then charged Wickes as if it had done the work. These allegations do not support the existence of hierarchical or consensual decision-making in an organization made up of the three Defendants joined together to defraud Wickes. The alleged structure in this case suffers from many of the same deficiencies found in the purported "enterprise" in *Limestone Development Corp. v. Village of Lemont, IL*, where the Seventh Circuit held that the complaint in that case, though factually detailed, was devoid of any "reference to a system of governance, an administrative hierarchy, a joint planning committee, a board, a manager, a staff, headquarters, personnel having differentiated functions, a budget, records, or any other indicator of a legal or illegal enterprise." 520 F.3d 797, 804 (7th Cir. 2008). Wickes' pleading merely demonstrates a situation where two of the three alleged conspirators have no connection to each other except for each parties' separate and distinct dealings with the third, Carpman. While such pleading may

support separate conspiracy charges against Carpman and Camco, and Carpman and Flortech; it does not support the existence of a RICO "enterprise" among the three parties.[3]

### 2. Pattern

The Defendants also claim that Wickes failed to plead a "pattern" of racketeering activity. The Supreme Court "has attempted to give definition to the pattern requirement to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992). A plaintiff's failure to sufficiently plead the pattern requirement "rings the death knell" for RICO claims under Section 1962. *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir. 1991).

Under 18 U.S.C. § 1961(5), a pattern of racketeering consists of at least two predicate acts of racketeering committed within a ten-year period. The Supreme Court has indicated, however, that although two predicate acts of racketeering are necessary to form a pattern, two acts alone will usually not suffice. *Corley v. Rosewood*, 142 F.3d 1041, 1048 (7th Cir. 1998) (citing *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989)). Instead, in addition to at least two predicate acts, a RICO plaintiff must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 1048 (quoting *H.J. Inc.*, 492 U.S. at 237). Thus, a RICO plaintiff must show "continuity plus relationship with respect to the alleged predicates." *Corley*, 142 F.3d at 1048.

---

[3] Having concluded that there has not been sufficient pleading regarding the existence of an enterprise, there is no need for this Court to consider FlorTech's concomitant contention that Wickes failed to properly plead that each of the Defendants participated in the "conduct" of the enterprise.

### *a. Relationship*

In order to satisfy the relationship element of the pattern requirement, the predicate acts of racketeering must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and [ ] not isolated events." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240 (internal citation omitted)). The relationship element is satisfied here because Wickes alleges Camco and Flortech shared similar purposes- conspiring with Carpman to defraud Wickes; achieved similar results - fraudulently extracting money from and causing economic harm to Wickes; with the same party- Carpman and the same victim- Wickes; through the same methods- submitting fraudulent bills and changing orders in contravention of the various anti-racketeering statutes.

### *b. Continuity*

Continuity is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. A RICO plaintiff "can prevail by either (1) demonstrating a closed-ended conspiracy existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended conspiracy that, while short-lived, shows clear signs of threatening to continue into the future." *Midwest Grinding*, 976 F.2d at 1023. It is unclear whether Wickes alleges an open-ended or a closed-ended conspiracy here, so the Court will analyze each.

### *(1) Open-ended Continuity*

An open-ended period of racketeering is a "course of criminal activity which lacks the duration and repetition to establish continuity." *Midwest Grinding*, 976 F.2d at 1023. A RICO

plaintiff satisfies the continuity requirement by showing past conduct which "by its nature projects into the future with the threat of repetition." *H.J. Inc.*, 492 U.S. at 242. A plaintiff shows a threat of continuity exists by pleading (1) a "specific threat of repetition"; (2) that the "predicate acts or offenses are part of an ongoing entity's regular way of doing business"; or (3) that the defendant operates a "long term association that exists for criminal purposes." *Midwest Grinding*, 976 F.2d at 1023 (quoting *H.J. Inc.*, 492 U.S. at 242-43); *see also Vicom, Inc. v. Harbridge Merch. Services, Inc.*, 20 F.3d 771, 782 (7th Cir. 1994).

Here, it is factually impossible to prove a specific threat of repetition in the future. When Wickes terminated Carpman in November 2005 (as alleged in the Amended Complaint), the Defendants' alleged racketeering activities ceased and could not possibly continue. Therefore, it would be impossible for a threat of specific repetition to exist. *See McDonald v. Schencker*, 18 F.3d 491, 497-98 (7th Cir. 1994) (once defendant was fired, the "threat of repetition" disappeared); *Midwest Grinding*, 976 F.2d at 1025 (when defendant resigned, any threat of illegal activity "ceased to exist"); *LaSalle Bank Northbrook v. Baker*, No. 94 C 3827, 1994 WL 630705, at *3 (N.D.Ill.) (when defendant went out of business, defendant's "alleged racketeering activities ceased and could not possibly continue"). It is readily apparent from Wickes' response brief that the racketeering activities stopped when Carpman was fired as Wickes states: "It is obvious that the participants would have continued their activity indefinitely had Wickes not called things off." Thus, the reality is that Wickes called things off and destroyed the Defendants' ability to commit future fraudulent acts against Wickes by removing Carpman.

Wickes does not contend that the alleged predicate acts are part of the Defendants' ongoing "regular way of doing business" or that the Defendants were operating a "long term

-15-

association that exists for criminal purposes." *Midwest Grinding*, 976 F.2d at 1023 (quoting *H.J. Inc.*, 492 U.S. at 242-43). Therefore, it is clear that Wickes has not satisfied the requirements for open-ended continuity.

### *(2) Closed-ended Continuity*

Wickes asserts it can prove a pattern of racketeering activity committed by the Defendants over a closed period of time. To do this, a plaintiff must "prov[e] a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. In deciding whether a plaintiff satisfies the continuity prong of the pattern requirement, post- *H.J., Inc.* decisions apply the factors set out by the Seventh Circuit in *Morgan v. Bank of Waukegan*. 804 F.2d 970, 975 (7th Cir. 1986). These factors include "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Id.*

The first factor examines whether Wickes' allegation that the length of time over which the predicate acts were committed was of a sufficient duration. Duration "is perhaps the closest thing we have to a bright line continuity test." *Midwest Grinding Co.*, 976 F.2d at 1024. In fact, duration is "the single most important aspect of the closed-ended continuity analysis." *Vicom, Inc.*, 20 F.3d at 781. Wickes argues that there is no logical support for courts' use of duration as an indicator of future harm, but there is no denying that in several post- *H.J. Inc.* decisions, the Seventh Circuit has underscored the importance of the duration element to the closed-ended continuity analysis. For example, in *Midwest Grinding*, the court found it significant that the duration of the predicate acts behind the closed-ended period of racketeering was only nine months. 976 F.2d at 1024; *Vicom. Inc.*, 20 F.3d at 780. Likewise, in *Uni\*Quality, Inc. v.*

*Infotronix, Inc.*, 974 F.2d 918, 922 (7th Cir. 1992), the court found that "one scheme that lasted at most seven to eight months" was "precisely the type of short-term, closed-ended fraud that, subsequent to *H.J. Inc.*, this circuit consistently has held does not constitute a pattern."

It is difficult to discern which acts of the Defendants' are alleged to be the predicate acts of the "enterprise". For example, Wickes alleges in the Amended Complaint that in general, Camco submitted and Carpman accepted change orders and bills via mail, courier and wire obligating Wickes to pay money in connection with its construction projects in California. However, Wickes concedes some of the orders were legitimate. Wickes goes on to allege specifically that Camco and FlorTech each made three fraudulent mailings of billing requests that began in May 2005 and ended in November 2005.[4] Wickes asserts that this is all it need plead to satisfy any "pattern" requirements. In Wickes' view, it has successfully alleged a series of predicate acts- individual fraudulent mailings, occurring over a time period of at least 6 months, which constitutes sufficient duration. However, six months is usually too short a time frame to suffice. *See e.g. Vicom. Inc.*, 20 F.3d at 780.

The next *Morgan* factor is the number and variety of predicate acts. Wickes has alleged each mailing or wire communication constitutes a distinct predicate act for a minimum of six predicate acts. This argument fails to constitute a pattern, however, because all of the alleged acts are the same or similar. *See Midwest Grinding*, 976 F.2d at 1024-25 (finding that a number of mailings that are "very similar to one another" do not show "a long-term criminal

---

[4] Wickes argues that it alleged the first act of "collusion" occurred in 2004, but the Amended Complaint does not contain any allegations of racketeering activity occurring in 2004. It merely explains that in 2004, Carpman successfully recommended Wickes contract with Camco, and later contract with FlorTech, in the construction of the Rancho store.

operation."); *see also Slaney v. The Intern. Amateur Athletic Federation*, 244 F.3d 580, 590 (7th Cir. 2001) (a multiplicity of mailings does not necessarily translate into a "pattern" of racketeering activity). Wickes alleges only one type of fraudulent act: using the mail system to send fraudulent bills. Though the act may have been repeated as many as six times, there was no variety in the predicate acts, and therefore the predicate acts are not sufficient to establish continuity.

The third and fourth *Morgan* factors are the number of victims and the presence of separate schemes. Wickes has alleged two separate schemes with it as the only victim. But this Court has already explained that Wickes has failed to allege any facts that implicate Camco in the Illinois scheme in which Carpman and Flortech purportedly conspired to defraud Wickes. The court, therefore, need not address those factors further. The fifth and final *Morgan* factor is the occurrence of distinct injuries. 804 F.2d at 975. The proper inquiry is "whether each of these injuries was 'distinct' in the sense that it signaled, or by itself constituted, a threat of 'continuing' criminal activity." *U.S. Textiles, Inc. v. Anheuser-Busch Co.*, 911 F.2d 1261, 1269 (7th Cir. 1990). The Court in *U.S. Textiles, Inc.* found a series of payments allegedly induced by fraud to not be distinct based upon the fact that they all emanated from a single contract and were economically identical. *Id.* In *Midwest Grinding*, the court held a series of losses of business over the duration of the alleged enterprise's racketeering activities resulting from numerous mailings were not distinct, instead they made were of only "one type of injury." 976 F.2d at 1025. In short, Wickes' injuries occurred several times, but were not distinct in type.

After considering all five of the *Morgan* factors, this Court concludes that the alleged acts of Carpman, Camco and FlorTech against Wickes do not demonstrate the existence of a

long-term criminal threat to society." *Id*. Ultimately, Wickes like many other civil RICO plaintiffs are merely "trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions...." *Id.*

### B. Supplemental State Law Claims

Having dismissed the RICO count of the Amended Complaint, the Court is divested of federal question jurisdiction over this matter. FlorTech's presence as a defendant (as an Illinois corporation) in this action eliminates diversity jurisdiction. This Court declines to exercise supplemental jurisdiction it may possess over the remaining counts of the Amended Complaint, and therefore, passes no judgment on either the sufficiency of their allegations or their underlying merits.

## IV. CONCLUSION

For the foregoing reasons, Defendants' 12(b)(6) motions to dismiss are GRANTED in part without prejudice as to Count VII entitled "Racketeering" and otherwise DENIED.[5] Having dismissed the only claim to which it had original jurisdiction, the Court declines to exercise supplemental jurisdiction, as is within its discretion pursuant to 28 U.S.C. § 1367(c)(3). This case is hereby dismissed without prejudice.

Enter:
/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **September 12, 2008**

---

[5] Wickes included in its response brief a half-hearted artificial request for leave to further amend the Amended Complaint should this Court conclude there were two enterprises instead of one. The artful purpose of that request was to make up for Wickes' inability to allege facts tying Camco and FlorTech together with the *same enterprise* with Carpman. Wickes' pleading failure does not mean that it successfully pleaded two enterprises, but rather that it unsuccessfully pleaded one. Leave to amend on that basis is DENIED.